UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


```
------------------------------ x
                               :
MATTHEW D. WILLIAMS,           :
               Plaintiff,      :      Civil No.
                               :   3:15-CV-00673(RNC)
          vs.                  :
                               :   February 10, 2016
RUSHMORE LOAN MANAGEMENT       :
SERVICES, LLC,                 :
               Defendant.      :
                               :
------------------------------ x
```

Federal Building
450 Main Street
Hartford, Connecticut


MOTION HEARING


(Transcription from Electronic Recording)


Held Before:

THE HON. DONNA F. MARTINEZ
United States Magistrate Judge



Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258
www.falzaranocourtreporters.com

A P P E A R A N C E S:

    <u>For the Plaintiff:</u>

        LAW OFFICE OF JOANNE FAULKNER
        123 Aven Street
        New Haven, Connecticut  06511-2422
        203-772-0395
            BY:  JOANNE S. FAULKNER,ESQ.


    <u>For the Defendant:</u>

        HUNT LEIBERT CHESTER & JACOBSON, PC
        50 Weston Street
        Hartford, Connecticut  06120
        860-240-9140
            BY:  GEOFFREY K. MILNE, ESQ.
                 JENNIFER M. McGRATH, ESQ.

```
 1                    (Proceedings commenced at 10:20 a.m.)

 2

 3              THE COURT:  Good morning.

 4              ALL:  Good morning, your Honor.

 5              THE COURT:  This is Williams v.

 6         Rushmore, 15-Civil-673 assigned to Judge

 7         Chatigny.  Will you identify yourselves,

 8         please?

 9              MS. FAULKNER:  I'm Joanne Faulkner,

10         your Honor.  I represent the Plaintiff,

11         Matthew Williams.

12              THE COURT:  Good morning.

13              MR. MILNE:  Good morning, your Honor.

14         Geoff Milne from Hunt Leibert on behalf of

15         Rushmore Loan Management Services.

16              MS. McGRATH:  Good morning, your Honor.

17         Jennifer McGrath also from Hunt Liebert on

18         behalf of the Defendant in this case.

19              THE COURT:  Good morning.  All right.

20         I have just one question that I want to ask

21         on the motion to substitute party, and

22         that's to Defendant's counsel.  In different

23         places in your papers you identify U.S.

24         Bank's principal place of business as in

25         Ohio and in Minnesota.  Which is it?
```

1           MR. MILNE:  You're absolutely correct,

2     your Honor.  The initial submission was

3     incorrect because it used the wrong test,

4     and that test was for the bank in its

5     banking capacity, not in its trust capacity.

6           THE COURT:  All right.

7           MR. MILNE:  The trust capacity is

8     Minnesota.

9           THE COURT:  Minnesota.

10          MR. MILNE:  And I apologize to the

11    Court for that.

12          THE COURT:  All right.  Thank you.

13          All right.  I want to proceed now to

14    the motion to compel.  I'm going to go

15    through the requests one by one and I'm

16    going to bounce back and forth between you

17    so it might be awkward at first but that's

18    the most efficient way for me to proceed.

19          So I'm going to begin with the

20    Plaintiff on Request Number 1.  Request

21    number 1 asks for all documents reflecting

22    your acquisition of the servicing of

23    Plaintiff's mortgage, and I understand that

24    the only thing in dispute is an unredacted

25    copy of the servicing agreement.

```
 1              MS. FAULKNER:  That's correct, your
 2        Honor.
 3              THE COURT:  Okay.  So tell me, please,
 4        why you need that.
 5              MS. FAULKNER:  One of the things in the
 6        complaint and one of the things in their
 7        answer is that they complied with their own
 8        policies and procedures.  When I asked what
 9        their own policies and procedures were they
10        said they are in this confidential document.
11              So in order to find out what the
12        policies and procedures that were applied in
13        this case and whether they were applied, I
14        think I have the servicing agreement be a
15        heavily redacted document which could be
16        produced in accordance with the protective
17        order that's already existing.
18              THE COURT:  Is that Judge Chatigny's
19        protective order?
20              MS. FAULKNER:  Yes, your Honor.  That's
21        a standard protective order that entered at
22        the beginning of the case.
23              THE COURT:  All right.
24        Defendant?
25              MS. MILNE:  If your Honor please, we
```

1           have produced a power of attorney that

2           identifies the relationship between Rushmore

3           and the investor U.S. Bank as trustee.  The

4           servicing agreement itself is not in the

5           public domain.  It deals with private

6           parties, not public entities.  It does

7           contain confidential and proprietary

8           business information, pricing information

9           and other competitive business information.

10               We have cited a case in our papers, the

11          *Irizarry* case where a Superior Court

12          decision found that a servicing agreement is

13          subject to confidentiality.

14               I'd also point out though and I think

15          there's an intellectual point of departure

16          in terms of the relevancy of the document.

17          This is a statutory federal claim that the

18          Defendant did or didn't do certain things

19          that violated the FDCPA.  They either did or

20          didn't do those things and they either

21          violate the statute or they don't.  There's

22          plenty of case law that says not only

23          borrowers not a third party beneficiary of a

24          (unintelligible) servicing agreement -- I've

25          recited the *Wells Fargo vs. Strong* case,

```
1                it's a Connecticut I think Appellate Court
2                decision, but also under federal law under
3                the Federal Regulations 12 CFR 1024.41(a), a
4                borrower can't use a loan servicing
5                agreement to attempt to enforce loss
6                mitigation requirements.
7                     So let me give your Honor the practical
8                reaction that I have to the document.  If we
9                tried the case today and the Plaintiff was
10               to offer the servicing agreement to prove up
11               the policies and procedures, I would I think
12               object saying it's irrelevant because either
13               Rushmore violated the FDCPA or they didn't,
14               and what their policy was has no bearing on
15               whether they violated the statute.  In other
16               words, they could have complied with their
17               policy and either been in compliance with
18               the federal statute or not, but it's not
19               relevant to whether they breached it.  The
20               question is what did Rushmore do with
21               respect to Mr. Williams on these specific
22               dates as alleged in the complaint.  And
23               either those communications were lawful or
24               they were illegal.
25                    THE COURT:  So aren't there some
```

1            instances in which the Defendant's good

2            faith compliance is an issue?  And if the

3            Defendant violated its own policies and

4            procedures wouldn't that be probative on the

5            issue of its good faith?

6                MR. MILNE:  I think their good faith

7            obligation stems from the specific federal

8            law loss mitigation requirements that

9            they're required to comply with.  So I think

10           that duty, if you will, or the compliance

11           obligation is a legal one based on those

12           regulations, not based on their policy and

13           procedure.  That's our position.

14                THE COURT:  All right.  What about

15           pricing information?  Is that something you

16           seek?  How would that be relevant?

17                MS. FAULKNER:  I would think that

18           pricing information would be confidential

19           and I am not interested in that.  I think I

20           said somewhere anything like a patent or

21           pricing information I would not ask for, but

22           the rest of it does go to how much damages I

23           can get, the intentional nature of the

24           violation.  And as they say in their own

25           answer counterclaim, we did everything in

1           good faith.  Either they did or this

2           document will show that they deviated from

3           what they thought was good faith.

4               THE COURT:  So am I to understand that

5           the only part of the document you want is

6           the part of the document that does go

7           through their policies and procedures?

8               MS. FAULKNER:  I want the whole

9           document, your Honor, because I don't know

10          what is buried in what sections.  There may

11          be some things I will never use and I won't

12          need, but that will only show up when I see

13          the document.

14              THE COURT:  Well, for example, we just

15          talked about pricing.  Counsel has made a

16          representation that there's pricing

17          information in there.  You don't want that.

18              MS. FAULKNER:  Right.

19              THE COURT:  I can't conceive of any

20          instance in which that would help the

21          Plaintiff.  Right?

22              MS. FAULKNER:  I can't but, your Honor,

23          we haven't looked at the --

24              THE COURT:  All right.  Well, we won't

25          -- okay.

```
1              So that's not relevant so you don't
2         need that.  That could be excised, couldn't
3         it?
4              MS. FAULKNER:  Oh, yes.
5              THE COURT:  All right.  So I'm really
6         pushing you beyond that and saying is there
7         anything in addition to that price.
8              MS. FAULKNER:  Not that I can tell from
9         the index that I got.
10             THE COURT:  All right.
11             MR. MILNE:  Your Honor, I think our
12        client would be sensitive to the identity of
13        the investors if that's in the document, and
14        I have to confess I didn't review it for
15        purposes of analyzing the actual scope of
16        all the information there.  And so the
17        identity of the investors, you know, what
18        percentage interests they have.  And then
19        also on policies and procedures I think it's
20        important that we identify what policies or
21        procedures.  Obviously this is a fairly
22        large company, so I don't know what the
23        Plaintiff -- what specific procedures
24        they're looking for, but that might be
25        helpful.  It doesn't change my analysis I
```

1           don't think that we don't perceive that it's

2           relevant and whether there's a breach, but

3           that issue aside what procedures are in

4           place I think needs to be defined so the

5           scope of what's -- obviously their hiring

6           procedures for employees wouldn't be

7           relevant and their origination, if they

8           originate loans, I'm not sure, but if they

9           had -- if they originate loans that wouldn't

10          be relevant.

11              So there's a whole series of things

12          that would fit with the policies and

13          procedures that wouldn't be applicable to

14          this case notwithstanding.

15              THE COURT:  And how would we sort that

16          through?

17              MR. MILNE:  I think the Plaintiff would

18          have to say what specific procedures they're

19          looking for and why and how they're relevant

20          to the case.  I don't want to start making

21          arguments on behalf of the Plaintiff but

22          they need to identify what specifically are

23          they looking for in terms of policies and

24          procedures; what issues.

25              THE COURT:  All right.

```
 1                    Plaintiff?
 2          MS. RAULKNER:  Once again, your Honor,
 3      I don't know until I see what it is.  There
 4      would be no hiring.  This is a servicing
 5      agreement.  There are no investors
 6      identified in a servicing agreement other
 7      than the signatories, which I already have.
 8      There would be no hiring or employment
 9      things in there.  It's just essentially how
10      they service mortgages and what their loss
11      litigation procedures are, which they claim
12      comply with the act and maybe they do, maybe
13      they don't.  That's something I have to see.
14          THE COURT:  What is in the servicing
15      agreement?
16          MS. FAULKNER:  Excuse me, your Honor.
17      I think there's an index there and I didn't
18      bring it.
19          Do you have the index?
20          THE COURT:  Okay.  Don't talk to each
21      other please.
22          MS. FAULKNER:  I'm sorry.
23          THE COURT:  Go ahead.
24          MR. MILNE:  If your Honor please, I
25      don't have the granular understanding of
```

1         that agreement that I should at the moment.

2         I've looked at it, but I looked at it last

3         fall on different points.  Generically I

4         think they're fairly broad in terminology

5         about, you know, normally what the ones I've

6         seen in the past and I've seen many over the

7         years, they typically say we will comply

8         with federal law on whatever the topic is or

9         we will service loans consistent with some

10        either statutory provision or some other

11        kind of term of art.

12             So, you know, if we're talking about a

13        Connecticut case, to me my instinct on this

14        topic would be it would have to be

15        Connecticut specific loans because if you're

16        talking about servicing non-performing

17        mortgages they're going to be state specific

18        because the law is different in all 50

19        states and most states are non-judicial

20        foreclosure.  So you're going to have to

21        deal with state specific Connecticut

22        nonperforming loans within the timeframe,

23        and then the second issue becomes what's the

24        waterfall, if that's the right word for the

25        loss mitigation on those loans in

```
 1              Connecticut within that timeframe.  And I
 2              don't know the answer to this.
 3                   My sense is that the servicing
 4              agreement probably it's a very bland terms
 5              of art and then we'd have to dive down into
 6              all those specific weeds to figure out
 7              what's there.  And after going through all
 8              that which is going to cost a tremendous
 9              amount of labor, time and expense for
10              somebody to go through all of those
11              different steps to figure it out, my
12              position at the end of the day is, well, how
13              is that relevant?  I mean either Rushmore
14              violated the FDCPA or they didn't, which
15              there's been 50-plus telephone recordings
16              produced of communications between Rushmore
17              and the borrower and Rushmore -- excuse me
18              -- and Rushmore and a lawyer or lawyers.
19              And either those were proper or they
20              weren't, and either the letters that were
21              sent were either in compliance or they
22              weren't.
23                   But I still don't see how there's
24              relevancy to the policies and procedures in
25              terms of whether there was a breach or not.
```

```
 1            I get the piece about was it intentional.  I
 2       think counsel can make the argument it was
 3       intentional.  She can certainly ask a
 4       witness on direct or cross did you
 5       intentionally do this; did you comply with
 6       your procedure, yes or no; is your procedure
 7       compliant.  But this is not a class action;
 8       this is an individual case, one borrower.  I
 9       don't see that it fits within a claim or
10       defense that's within the case for purposes
11       of being proportional on Rule 26.
12            THE COURT:  How long is the servicing
13       agreement?
14            MS. MILNE:  I think it's a couple
15       hundred pages is my guess, your Honor.
16            MS. FAULKNER:  It's 64 pages with
17       Exhibits A through I, so about 70 pages I
18       guess.
19            Excuse me, I can see that Ms. McGrath
20       has the document.
21            THE COURT:  All right.  How long is it?
22            MR. MILNE:  Your Honor, we have the
23       redacted one.
24            MS. FAULKNER:  But you had the index
25       which --
```

```
1              THE COURT:  Don't talk to each other.
2              MS. FAULKNER:  The index would be the
3         first couple of pages.
4              THE COURT:  Yep.
5              MR. MILNE:  If your Honor please, what
6         I'm looking at at the moment is -- I'm happy
7         to bring this to your Honor -- is the
8         redacted version and it has the index goes
9         up to page 68 and I don't know the length of
10        the exhibits.
11             And there are, to be clear, there are
12        Exhibits A through I.  I'll note that one of
13        the exhibits presumably in the unredacted
14        document is a mortgage loan schedule, so
15        that might be rather extensive and so that's
16        -- and we're looking at the moment for the
17        unredacted version, your Honor.  I don't
18        know if you have the unredacted version.
19             THE COURT:  Okay.  I think I understand
20        your positions.  Let's go to Request Number
21        3.
22             Request Number 3 asks for your
23        attorney's account notes, collection records
24        and records of communications in connection
25        with Plaintiff's mortgage.
```

```
 1                    Go ahead, Ms. Faulkner.

 2                    MS. FAULKNER:  Yes, your Honor.

 3                    Collection records are typically what I

 4           ask for and what I get with regard to any

 5           FDCPA action.  I'm not asking for any

 6           records after the start of the litigation,

 7           obviously.  I'm just asking for the

 8           communication prior to the start of

 9           litigation.

10                    For instance, one of the claims here is

11           that Rushmore was reporting that a

12           foreclosure had been started.  No

13           foreclosure had been started, but Rushmore

14           was clearly under the impression that there

15           was a mortgage foreclosure going on and at

16           one point gave a specific date of when the

17           judgement was going to enter.

18                    So I don't know where they got the idea

19           but it must be through third party

20           information that they were collecting from

21           their outside counsel.  So I want to know if

22           the information was coming from outside

23           counsel.  They're just various

24           communications that usually are related to

25           the collection practices.
```

```
1                    THE COURT:  Okay.

2               Defendant?

3                    MR. MILNE:  If your Honor please, the

4               system that I think contains these records

5               and we have them for your Honor's review if

6               your Honor would like to review them on an

7               in camera basis.  There's a software system

8               that I will call it called Black Knight and

9               in general terms that is a system in which a

10              loan servicer communicates with its outside

11              counsel, in this case Hunt Leibert, about

12              the prosecution of a foreclosure, everything

13              from the initial referral documents being

14              downloaded to privileged communications

15              about the manner and method of the

16              foreclosure.

17                   And to be clear, there was a 2010

18              foreclosure that was dismissed on dormancy

19              and I have a chronology, I don't recall the

20              date, and I think that the dismissal enters

21              March 12ᵗʰ of 2013, and I believe counsel's

22              position is that there were statements made

23              by Rushmore that misrepresented the status

24              of that foreclosure action after Rushmore

25              began servicing the loan which was in 2013
```

1          to be clear.  There was prior plaintiff, I

2          believe prior owner of the loan that

3          prosecuted the initial case so it was a

4          different party.

5              But our position on the discovery issue

6          is that the communications between the

7          client and our firm are privileged and we

8          have not produced the Black Knight

9          documents.  Our firm was counsel of record

10         in the what I'll call the BAC Home Loan

11         Servicing case, and we have records that

12         deal with communications between Hunt

13         Leibert and the client in that case that

14         have not been produced that are subject to

15         attorney-client privilege.  And the reason

16         we have not produced them is because they're

17         subject to privilege.

18             THE COURT:  How many are there?

19             (Pause.)

20             MR. MILNE:  Your Honor, for Rushmore

21         there's 354 pages and then -- and

22         approximately 20 for the BAC case.

23             THE COURT:  Ms. Faulkner, you're

24         seeking all of those?

25             MR. MILNE:  I am not interested in the

```
 1              prior foreclosure, your Honor.  I'm just
 2              interested in anything relating to the 2014
 3              and thereafter prior to the date of the
 4              litigation.
 5                   THE COURT:  So am I to understand that
 6              you don't want the so-called BAC documents?
 7                   MS. FAULKNER:  Right.
 8                   THE COURT:  Okay.
 9                   MS. FAULKNER:  I had filed something
10              with X's indicating what I thought was
11              within the timeframe I wanted and the --
12                   THE COURT:  Right.  So you're -- I'm
13              sorry.
14                   MS. FAULKNER:  Go ahead, I'm sorry.
15                   THE COURT:  You're looking for the 354
16              Rushmore documents.
17                   MS. FAULKNER:  Yes.
18                   THE COURT:  Okay.
19                   MS. FAULKNER:  I didn't know there were
20              that many, but yes, I'm looking for the
21              Rushmore documents prior to the inception of
22              this case.
23                   THE COURT:  All right.  So it won't
24              surprise counsel to hear that I don't want
25              to go through 354 documents.  I don't know
```

1          that I will look at these in camera, but if

2          I do look at them in camera are there

3          exemplars?  In other words, are there

4          categories of documents that I could look at

5          and make a determination on, that

6          determination then governing the rest of the

7          documents in that group?  You follow me?

8          There's case law on those.

9               MR. MILNE:  I follow you although I

10         don't know how to apply it practically.  May

11         I ask counsel a question on the record about

12         specifically what it is she's looking for so

13         I can try and narrow the scope?

14              THE COURT:  All right.

15              Ms. Faulkner?

16              MS. FAULKNER:  As is usual with an

17         FDCPA case I don't know what I'm looking for

18         until I see it.  Everything -- well, for

19         instance, the privilege log doesn't even

20         indicate that a lot of these communications

21         through a third party were between lawyers

22         or involved lawyers.  A lot of them didn't

23         seem to involve legal advice but just

24         factual back and forth.  So I don't think

25         they're privileged but it's the type of

```
 1              thing you don't know what you want until you

 2              get it, unfortunately.

 3                   THE COURT:  Um-hum.

 4                   MR. MILNE:  Well, your Honor, I will

 5              perhaps try to narrow this.  If counsel is

 6              looking for information about whether our

 7              firm knew about whether Mr. Williams was

 8              represented by counsel, there is nothing in

 9              the Black Knight records that shows that he

10              was represented by counsel.  So if that's --

11              I know obviously that's an issue that's been

12              made in the case that when our firm sent a

13              debt validation letter under the FDCPA I

14              think the summary judgement argument or one

15              of them anyway, is that that violated the

16              FDCPA because he was represented by counsel.

17                   So there's nothing in there that would

18              show that and in fact in the BAC case he was

19              actually self-represented.  So the Court has

20              a comfort zone if the Court wants it.

21              That's why we have the documents here for in

22              camera review and I'm comfortable if -- and

23              happy to work with counsel to try to come up

24              with the categories.  I mean that's

25              representation obviously; that's one issue I
```

```
1            can see in the case.  I don't know what
2            other issue would be in the case that they
3            want us to attempt to try and locate for
4            purposes of an exemplar or in camera review
5            or what have you.
6                I obviously am concerned about just
7            taking a whole -- since we have a
8            foreclosure claim in the case at least
9            subject to a motion to dismiss, I obviously
10           don't want to turn over privileged documents
11           to counsel to deal with a pending case or
12           arguably pending case here before your
13           Honor.
14               THE COURT:  How can we narrow this?
15               MS. FAULKNER:  He has just made a
16           representation about what it has in it.  I
17           don't have to rely on his representations,
18           your Honor.  I would like to see what these
19           documents are.  And again I'm not asking for
20           anything after the beginning of this lawsuit
21           because this foreclosure that he's talking
22           about is after the beginning of the lawsuit.
23           So it would be just documents between
24           Rushmore and this Black Knight third party
25           and --
```

```
1              THE COURT:  I understood that Black
2         Knight is a software program.
3              MR. MILNE:  In other words, as I
4         understand it -- may I, your Honor?
5              THE COURT:  Yes.
6              MR. MILNE:  As I understand it Rushmore
7         is here, the outside counsel is here and the
8         software media that communicates is Black
9         Knight.  So you would go onto a computer
10        system, sign onto the system, sign onto
11        Black Knight and then you can send -- I'll
12        call them emails.  I don't actually use the
13        system but I think they're like emails or
14        something like an email.  And you can upload
15        documents, client does the same thing, and
16        so both sides can see the information that's
17        maintained in the database.
18             THE COURT:  So Rushmore is feeding
19        information into the software program and
20        the law firm can read it and take action on
21        the basis of those documents or entries.
22             MR. MILNE:  That's correct, your Honor.
23             THE COURT:  Okay.
24             MS. FAULKNER:  And the software program
25        is maintained I think by a third party
```

1          organization called Speer which sells this

2          software between lots of mortgagers and lots

3          of servicers.

4               THE COURT:  Is that correct?

5               MR. MILNE:  I don't know who sells it,

6          your Honor.  I'm sorry, I don't know.  I

7          know it's used in the industry itself but I

8          don't know who sells it or any of those

9          types of things.

10               THE COURT:  So who has access besides

11          the law firm?  Does anyone?

12               MR. MILNE:  Well, obviously the client

13          has access to it and I think the way it

14          works would be if you're a national servicer

15          and you have counsel in all states there is

16          a firewall I guess where there's access for

17          specific law firms to look at their

18          information and then it's like a spoke on a

19          wheel, everybody gets to see their slice of

20          it only but -- and a client gets to see all

21          of it, but all the outside recipients get

22          their slice only.  And so I think it

23          contains all of the information on a

24          national level for a national servicer.

25               THE COURT:  And the 354 pages are the

1          slice that went to your law firm.

2              MR. MILNE:  That's correct, your Honor.

3              THE COURT:  And they're in connection

4          with the foreclosure that right now is the

5          counterclaim is it?

6              MR. MILNE:  That's correct, yes.  As

7          far as I know.  I don't know when we were

8          retained.  I should know that, I apologize,

9          but Rushmore began servicing the loan in

10         July of '13 and I believe that we sent our

11         validation letter in roughly September of

12         the fall of '14.  So we can pinpoint the

13         date that we were actually retained, but in

14         any event those seem to be the relevant

15         dates.

16             THE COURT:  And I'm hearing you say

17         that the -- you say the cutoff is when the

18         litigation began.

19             MS. FAULKNER:  This litigation, yes,

20         your Honor.

21             THE COURT:  But doesn't the rule also

22         cover documents generated in anticipation of

23         litigation?

24             MS. FAULKNER:  Well, as I understand

25         the rule if they are claiming attorney-

```
1              client privilege I can't get anything after
2              I started this litigation.  I may be wrong
3              but I don't know.  I think they thought they
4              had litigation going on and that's one of
5              the points of the request, is somehow
6              Rushmore got the idea that there was
7              foreclosure here ongoing in Connecticut that
8              was about to go to judgment.  So it was
9              actual litigation in the minds of Rushmore
10             rather than anticipated litigation.
11                  THE COURT:  All right.
12                  MR. MILNE:  Your Honor please, Attorney
13             McGrath is pulling the document.
14                  As I understand the claim on the
15             foreclosure is that there was a dismissal
16             and that there were misrepresentations by
17             Rushmore with respect to the status of that
18             dismissal.  So --
19                  THE COURT:  So the so-called BAC
20             foreclosure was dismissed for lack of
21             prosecution as I hear you.
22                  MR. MILNE:  Right.  Right.  In 2013.
23             And so I guess what counsel is arguing is,
24             well, did -- was Hunt Leibert I suppose,
25             were they telling the client that it was
```

1          active I suppose is what they're saying.
2              THE COURT:  Or Rushmore was telling the
3          client that it was active, right?
4              MS. FAULKNER:  Rushmore, yes.  Exactly.
5              MR. MILNE:  So I don't think it -- I
6          don't know it to be certain because I don't
7          use the system but I don't think these will
8          contain communications from Rushmore to Hunt
9          Leibert and Hunt Leibert to Rushmore.  If
10         there were communications from Rushmore to
11         the owner of the loan I don't know that
12         those would be contained in here.  But I
13         have no -- I'll leave it to the Court's
14         discretion.
15             I'm happy if the Court wants me to go
16         through to figure out what, if anything, our
17         firm said about the status of the BAC case.
18         I will do that, and report that if your
19         Honor wants to see those on an in camera
20         basis.
21             THE COURT:  I heard Ms. Faulkner say
22         she's not interested in those, so she's
23         abandoned that part of the request.
24             MS. MILNE:  Okay.
25             THE COURT:  Those are the 20 pages, the

1      BAC documents she doesn't want.

2            MR. MILNE:  Okay.  And so if -- I'm

3      happy to go through -- whatever the

4      categories I'm happy to go through to

5      isolate it to try and move the process along

6      if that's helpful.

7            THE COURT:  All right.

8            All right.  Request Number 4 has been

9      resolved.

10           Request Number 7, your agreements with

11     the current mortgage holder.  And is the

12     only document at issue the unredacted

13     servicing agreement?

14           MS. FAULKNER:  Yes, that's right.  And

15     also for protection 10; that's the only

16     document that issues a protection.  1, 7 and

17     10 all relate to this redacted servicing

18     agreement.

19           THE COURT:  Were there any different

20     arguments on Request Number 4?  Anything I

21     haven't heard?

22           MR. MILNE:  That deals with the -- is

23     that the credit?

24           THE COURT:  It says your agreements

25     with current mortgage holder.  Rushmore's

1          agreement with the current mortgage holder.

2              MR. MILNE:  I know your Honor --

3              MS. FAULKNER:  That's number 7.

4              THE COURT:  That's number 7, yes.

5              MS. FAULKNER:  Right.  I think it's the

6          same argument.

7              MR. MILNE:  Same argument on the

8          servicing letter, your Honor.

9              THE COURT:  Okay.  And Request Number

10         10, all documents authorizing defense

11         counsel to represent Rushmore or a GMAT

12         (phonetic) trust in a foreclosure proceeding

13         as to the Plaintiff.  Defendant represents

14         that it's withheld correspondence between

15         the Defendant's representatives and

16         Defendant's law firm that are in the

17         privilege log.

18             So this is more than a retainer

19         agreement.  That's not what you're seeking.

20         You want all these documents we've talked

21         about before?

22             MS. FAULKNER:  Yes, that's part of the

23         privilege log I think that I want.

24             THE COURT:  And how is it that all

25         those -- all that back and forth, all that

1          correspondence presumably about the status

2          of the debt and whatnot, how is that a

3          document authorizing you to represent

4          Rushmore?

5               MR. MILNE:  Well, let me deal with her

6          retainer agreement first.  My recollection

7          of it is that not only is it just, you know,

8          kind of a bare bones retainer agreement, it

9          deals with manner or method of the

10          prosecution of foreclosure.  So I think the

11          retainer agreement is privileged because

12          it's not simply a retainer agreement.  It

13          deals with the scope and extent of the

14          prosecution of the foreclosure.

15               And then I think your Honor is asking

16          me whether the communications in Black

17          Knight are privileged.  Is that --

18               THE COURT:  No.  What I'm saying is

19          that the request is for the documents that

20          authorized your law firm to represent

21          Rushmore.  And what you're saying in

22          response is, well, I'm not giving you

23          anything on my privilege log, but the

24          privilege log goes way beyond, or so it

25          appears to me it goes way beyond documents

```
 1              that authorize you to represent your client.
 2              Right?  It's all kinds of, you know, back
 3              and forth on the mortgage and the
 4              foreclosure, and it doesn't have to do with
 5              retaining you.
 6                   MR. MILNE:  No, that's true, your
 7              Honor.  We have a separate -- and I'm not
 8              sure I'm understanding the issue exactly,
 9              but we have a separate retainer agreement.
10              It's a several page letter, and in that
11              letter has -- there are requirements about
12              what we're supposed to do in connection with
13              the prosecution of the case.  And putting
14              aside what's contained within the privilege
15              log and whatever discrepancy there may be
16              between the identification of the documents,
17              I'm not aware of any communications that our
18              firm has with Rushmore on the retention that
19              go beyond either what may have been in Black
20              Knight and also the actual retainer letter,
21              first I think the unsigned one and then the
22              signed one, and the only other thing we
23              typically would get is a bailee letter when
24              an original note is delivered to us to say
25              that we're going to hold the original note
```

1          and have that in our possession.  And I

2          think we produced the bailee letter.  If we

3          didn't I'll review that.

4               THE COURT:  All right.  Let's go to

5          number 16.  All records of your

6          communications about Plaintiff's account

7          with the credit bureaus, including each

8          periodic report since you acquired the

9          account and any consumer dispute

10         verification forms.  Defendant says it has

11         withheld nothing.  Plaintiff says this is

12         still in dispute.

13              MS. FAULKNER:  What they gave me, your

14         Honor, was one sheet of paper which is

15         unintelligible.  It seems to be a summary of

16         when they reported and what they reported,

17         but it doesn't say to whom they reported and

18         it doesn't give me the meanings of various

19         abbreviations, time frames.  What it is is a

20         surface document.  There are electronic

21         records behind it that went into the

22         preparation of this summary surface

23         document, and it's the electronic records

24         that they uploaded to the credit bureaus

25         that I am interested in.

```
 1              THE COURT:  Okay.
 2              MS. FAULKNER:  We were talking before
 3         about resolving this a little bit and what I
 4         said was if Mr. Bennett who keeps -- who
 5         doesn't want to be deposed but keeps filing
 6         affidavits, would give me an affidavit as to
 7         the meaning of this, you know, that I could
 8         use in discovery or in trial to explain what
 9         it is, that would be satisfactory in
10         addition to the two credit reports they
11         pulled in 2014, which they have not
12         produced.
13              You know, I can guess at some of the
14         things that this document means but I can't
15         guess at all the columns and I certainly
16         can't testify as to what they mean because
17         it's my guess.
18              THE COURT:  Okay.
19              MR. MILNE:  If your Honor please, I did
20         speak with counsel before we started this
21         morning and I'm comfortable recommending
22         that our client prepare an affidavit that
23         explains the -- what I'll identify as Bates
24         number 1484 and there may be more than one
25         page but which deals with their credit
```

1            reporting history on the account or the

2            credit reporting history on the account

3            because I don't know how far it goes back.

4            And so I am comfortable recommending that we

5            do that.  I don't have an issue with it.

6                I would say that we've reviewed with

7            the client whether the credit reporting

8            documents have been produced.  They've

9            identified to us that they have.  In fact

10           when we reviewed that with the client we

11           ultimately went to an affidavit which was

12           submitted on that issue.

13               So, you know, I understand counsel's

14           position.  All I can say is we raised the

15           issue, we've addressed the issue, that's

16           what we have been told and I'm happy to go

17           back and get an explanation of what the

18           codes are.

19               And apparently, Counsel, we've produced

20           a credit report, I don't remember the -- I

21           think it was Experian report if I remember

22           it right, and counsel saying that are two

23           other reports that need to be produced and I

24           will review with client, A, if they have

25           them, and if they do they will need to

1          produce them and that we do produce them.

2              But again, I think client has indicated

3          to us that they've given us the information

4          they have with respect to that request.

5              THE COURT:  What are the two other

6          reports; do you know?

7              MS. FAULKNER:  There's July of 2014 and

8          September of 2014 I believe.  It's in my

9          papers if my recollection of dates is

10         incorrect, but they pulled two additional

11         reports which they did not give to us.

12             THE COURT:  All right.  So, yes, so

13         enter an order that the two other reports

14         must be produced and upon agreement of

15         counsel the Defendant will prepare this

16         affidavit on Bates number what, did you say?

17             MR. MILNE:  It's 1484, your Honor.

18             THE COURT:  Okay.  All right.  So

19         that's the end of the motion to compel.

20             I'm going to go to now the Plaintiff's

21         motion for summary judgment.  So let's hear

22         from the Plaintiff first, and again I might

23         interrupt you, I might interrupt the flow so

24         that you can go back and forth a little bit

25         issue by issue.  But Plaintiff, why don't

```
 1              you begin.  Why don't you begin with what
 2              seems to be the pivotal issue and that's
 3              whether the Plaintiff was represented by
 4              counsel with respect to such debt, and
 5              whether the documents that authorized
 6              Defendant to talk to counsel are the same as
 7              saying don't talk to me, I'm represented by
 8              counsel.
 9                   MS. FAULKNER:  Well, to start with,
10              don't talk to me, the consumer does not have
11              to say don't talk to me.  The consumer only
12              has to say so-and-so is my counsel.
13                   THE COURT:  Yeah.
14                   MS. FAULKNER:  And that's all they have
15              to say.  Once Rushmore asks them to fill out
16              -- my client to fill out certain forms
17              identifying the counsel at that point there
18              was only one loan in question.  There has
19              never been any other loan in question
20              between the parties.
21                   At that point by operation of law
22              Rushmore had to communicate only with the
23              attorney, and they continued to communicate
24              with both the attorney and my client,
25              sometimes on the same day, which is just
```

1          strictly on the face of the statute

2          prohibited.

3               THE COURT:  So the Defendant's argument

4          seems to be that because all you have is

5          this document that authorizes the lawyer to

6          be one of the people that communicates on

7          the debt, that's insufficient to meet your

8          burden; that it doesn't rise to the

9          preponderance level and therefore you're not

10         entitled to judgment.

11              MS. FAULKNER:  The face of the statute

12         says that all they have to do is know

13         somehow that this person is represented by

14         counsel and be able to ascertain the address

15         and contact information of counsel, which

16         Mr. Williams gave them.

17              At that point they could not

18         communicate with the consumer unless they

19         had the permission of the attorney.  That's

20         just the black and white of the statute.

21              THE COURT:  Okay.

22              Go ahead, Defendant.

23              MR. MILNE:  If your Honor please,

24         before I respond to that directly I think we

25         have an intellectual point of departure with

1           the Plaintiff about the scope of the FDCPA

2           in the context of the facts of this case.

3           There are cases we've cited in our papers

4           that say that the foreclosure of a mortgage

5           in and of itself is not debt collection, and

6           we've acknowledged contrary of 40 (phonetic)

7           in other circuits, from my understanding

8           there are a series of cases including one

9           from this courthouse with Judge Bryant in

10          which the Court has held that the mere act

11          of foreclosing a mortgage without seeking a

12          deficiency judgement is not debt collection,

13          and that's highly relevant here because the

14          debt here was discharged in bankruptcy back

15          in 2010.

16              So at no point was Rushmore or any

17          whoever held the paper capable of obtaining

18          a deficiency judgment.  It was in rem relief

19          only, and that theme I think is important in

20          this case because our position is that under

21          those facts you're not collecting a debt to

22          begin with.

23              But with respect to the issue of

24          representation the statute is clear and we

25          emphasized it in our papers, has to be

1            representation with respect to the debt.

2            With respect to the debt.

3                  Their papers don't have copies of

4            retainer letters from the lawyers that show

5            that the lawyers were retained with respect

6            to the debt.  The two people they identify,

7            one was a bankruptcy lawyer where there was

8            a discharge in 2010; and the other person

9            apparently was a closing lawyer.

10                 The record in the plans submissions

11           shows that Mr. Williams was pro se in the

12           foreclosure case, the BAC case.  The

13           authorizations don't preclude Rushmore from

14           communicating with their own customer.  They

15           simply authorize other people like spouses

16           and real estate agents to have access to the

17           information.

18                 So our position is that there is no

19           evidence of record that shows that Mr.

20           Williams was represented by counsel with

21           respect to the debt.

22                 Secondly, Mr. Williams communicated six

23           times directly at a minimum with our client,

24           and under the statute the FDCPA does not

25           apply to communications from the consumer to

1           the debt collector that the debt collector

2           then has to respond to.

3                 So let's put some flesh on the bones

4           here.  Mr. Williams was looking for a loan

5           modification.  He made no less than three

6           applications for a loan modification.  And

7           those communications began in July of 2013

8           when he asked, he calls Rushmore and asks

9           for a loan modification.  Under federal law

10          at that point Rushmore is obligated to

11          respond to that.  They have no choice, and

12          if they don't they have a regulatory

13          problem.

14                So they respond to that and then April

15          14th of 2014 Mr. Williams calls Rushmore to

16          discuss the terms of a loan modification.

17          June 6th of 2014 Mr. Williams calls Rushmore

18          to discuss additional terms of the loan

19          modification.  He then apparently is unhappy

20          with the status of that process.  There's a

21          dispute about his income.  Mr. Williams

22          sends an email, June 12th of 2014 with

23          respect to his income, and August 4th of 2014

24          Mr. Williams writes to Rushmore disputing

25          the accuracy of appraisal.  And September 3rd

```
1              of 2014 he submits a copy of the

2              stockholder's draw.

3                   All of that was part of loss mitigation

4              to address whether it was short sale or a

5              modification of the mortgage loan, but none

6              of the responses that come from Rushmore

7              trigger FDCPA liability because the

8              communications were initiated by the

9              consumer.

10                  And with all due respect to counsel,

11             what I don't think has happened is they

12             haven't established that he was represented

13             with respect to the debt and then the

14             specific communication that was violated.

15             They admit in their papers they were no

16             cease communication; they don't claim that

17             that there was a cease communication, don't

18             talk to me, talk to my lawyer.  They don't

19             say that there was one effected and deny

20             that there was one.

21                  So what they're taking is the loss

22             mitigation authorization that says you can

23             talk to my wife, you can talk to my brother,

24             you can talk to my real estate agent and

25             using that to say that that means you can't
```

```
 1              talk to the borrower at all.  Well, it
 2              doesn't say that, and that's a question of
 3              fact.
 4                   The scope of that agency, whatever it
 5              is that they claim meant that's legal
 6              representation, you can't talk to the
 7              borrower.  That's a question of fact,
 8              whether it's a bench trial or a jury case.
 9              But they haven't met their burden to prove
10              that these specific lawyers were
11              representing the borrower with respect to
12              the debt, and then even if they do have
13              evidence sufficient to reach that we weren't
14              collecting a debt anyway.  We were
15              foreclosing a mortgage, and we're barred
16              from getting any in rem relief.
17                   So our position is even if you're doing
18              loss mitigation on a mortgage that you can't
19              obtain a deficiency judgment.  It's not debt
20              collection.  Your remedy isn't a deficiency
21              against the borrower to execute on their
22              wages, it's to foreclose a piece of real
23              estate.  And that's where we part company
24              intellectually.
25                   THE COURT:  All right.
```

1           Is there any dispute that the Defendant

2           is a debt collector?

3               MR. MILNE:  For purpose of this case,

4           no, and let me just explain it, your Honor.

5           At the time the servicing was acquired the

6           loan was in default for a number of months.

7           And I don't know the answer to this question

8           but if we are foreclosing a mortgage for in

9           rem relief only the loan is in default, but

10          I think we perceive we're a debt collector

11          because we're not collecting a debt.  So I

12          think that encapsulates our position.

13              THE COURT:  Well, I'm not sure what

14          that is.  I heard you say you don't dispute

15          you're a debt collector but then you're

16          relying on this, the distinction in I think

17          the Judge Bryant case to say that you're not

18          a debt collector.

19              MR. MILNE:  Right.  And to be clear,

20          the reason I vacillated on that, if that's

21          the right phrase, is that there's no dispute

22          that the loan was in default at the time

23          that these communications occurred, so that

24          that's clear.  But we weren't seeking to

25          collect, for example, a deficiency

1          judgement.

2               THE COURT:  I understand.

3               MR. MILNE:  So I suppose to answer your

4          Honor's question I think the ultimate legal

5          conclusion is we're probably not a debt

6          collector for the reasons I stated although

7          the loan was in default at the time that the

8          communications occurred.

9               THE COURT:  Okay.

10              MS. FAULKNER:  It's quite amusing that

11         they were not trying to collect the debt

12         when they offered payment arrangements and

13         accepted payment arrangements, and were

14         engaged in loss litigation which would

15         sometimes result in modification of payments

16         and so forth.

17              There was no foreclosure at all, so

18         whatever they were doing was not strictly

19         foreclosure.  So I think that it's clear

20         that they were trying to collect this debt

21         by one means or another.

22              THE COURT:  So I think I'm constraining

23         counsel too much in trying to go point by

24         point because the points bleed over into one

25         another.  So I think I ought to go back and

1          leave it to you to argue your positions as

2          you see fit.

3              So I'm sorry, I've thrown you a curve

4          ball but I recognize now having started the

5          argument that I'm making it more difficult.

6              So why don't we give the mic to Ms.

7          Faulkner.

8              MS. FAULKNER:  Well, I think we've

9          probably covered most of it.  Rushmore is a

10          debt collector because it acquired the loan

11          after default admittedly.  It has made

12          efforts to have Mr. Williams make payments;

13          it has accepted payments from Mr. Williams;

14          it has tried to modify the mortgage

15          proposing terms of payment, changes terms of

16          payment.  So it is a debt collector.

17              The mortgage is on his home, on his

18          residence.  No one has ever disputed that,

19          so it is a consumer debt.  And the only

20          other question is whether they violated the

21          act, and they violated the act in a number

22          of respects.  But this one seems to be, as I

23          keep saying, the black letter of the law

24          says once you know a consumer is represented

25          by an attorney you have to communicate only

1          with that attorney.

2               Now, if they didn't think that Mr.

3          Williams was represented by these attorneys

4          all they had to do was communicate with the

5          attorneys and say we are told to communicate

6          with you.  And if the attorney writes back

7          and says don't do it, then they've got their

8          permission to go back to Mr. Williams.

9               But Mr. Williams wanted to have an

10         attorney represent him, especially with the

11         loss mitigation material because that's

12         complex; it's something that a layperson

13         doesn't understand.  But he wants to save

14         his home and so he hires an attorney to do

15         the negotiations for him.

16              We don't have to prove that he hired

17         the attorney.  All we have to prove is that

18         Rushmore was informed that he had an

19         attorney, and we've done that.  Rushmore

20         admits that they were informed that he had

21         an attorney.

22              THE COURT:  So, how about the

23         communications initiated by the Plaintiff?

24              MS. FAULKNER:  The cases they're

25         relying on are what I call entrapment

1          communications.  Someone sees a debt on
2          their credit report and they call the
3          collection agency and say what's this about.
4          And then they sue the collection agency for
5          not giving the 1692g 30-day dispute notice.
6          But that's not this case.  This case is
7          Rushmore initiating the communications
8          because it's obliged to do so by federal
9          law.  It's obliged to engage in loss
10         mitigation by federal and state law.
11             So whether he made a phone call to them
12         or not doesn't make any difference in the
13         outcome of this case because they shouldn't
14         have talked to him.  And that's what most
15         collectors do if they have my name on the
16         file and my client calls in, they say we
17         can't talk to you, and they don't.  That's
18         what the law requires.
19             So here every time Mr. Williams called
20         in they said -- they should have said,
21         sorry, we need to talk to your attorney.
22             THE COURT:  And how about the
23         communications by the adversary law firm?
24             MS. FAULKNER:  Well, it looks to us
25         like Rushmore was blocked in further

1          communication and wanted to set the ball

2          rolling, so they told Hunt Leibert to

3          communicate.  And they just can't do that.

4          Of course we know that they knew that Mr.

5          Williams was represented by an attorney and

6          they wanted to get his attention is what I

7          think.  But they just cannot go to Hunt

8          Leibert and say communicate with this guy

9          and not tell him that they knew he was

10         represented by an attorney.

11              THE COURT:  Um-hum, okay.

12              MS. FAULKNER:  And that's, you know,

13         there are two issues here, and you can

14         decide one or the other, it doesn't matter

15         to me.  But I think they are both well

16         supported in case law.

17              MR. MILNE:  If your Honor please, our

18         position as I stated earlier is that this is

19         not debt collection because we're

20         foreclosing a mortgage.  But I differ with

21         counsel in terms of what evidence is in the

22         record.  The mere fact that there is an

23         authorization to speak with a third party

24         doesn't mean that -- and the authorization

25         doesn't state that Rushmore is prohibited

1          from communicating with the consumer, their

2          own consumer, their customer.

3              In this case that authorization also

4          required if it was a lawyer that the lawyer

5          send a letter of representation to identify

6          the scope of the representation; was it with

7          respect to the bankruptcy or was it with

8          respect to the debt; was it with respect to

9          something else.

10             THE COURT:  But we're going to hear

11         from Ms. Faulkner that, you know, whatever

12         the bureaucratic requirements of the

13         collection agency can't supplant the

14         requirements of the statute.  So you can't

15         say, well, sorry, you need to fill out form

16         27 or we're not going to consider you

17         represented by counsel.  I think that's what

18         I'm going to hear back.

19             MR. MILNE:  I think that's true that

20         you'll hear that but it doesn't change the

21         burden of proof in the case and they've made

22         their submission as they made it.  And Mr.

23         Williams' affidavit, his own affidavit,

24         doesn't say that he retained a lawyer with

25         respect to the debt.  It doesn't say that.

1              THE COURT:  So Ms. Faulkner says,

2         well, there's no other topic of discussion.

3         There's one debt, that's what all the

4         communications are about, period.

5              MR. MILNE:  And there is nothing in the

6         four corners of those submissions that

7         demonstrates there was representation with

8         respect to the debt.  In fact, in the prior

9         foreclosure Mr. Williams was pro se, he

10        didn't have a lawyer; he defended himself.

11        And even if your Honor credits the argument

12        that he was represented by counsel, although

13        we dispute that, that doesn't change the

14        fact that when Mr. Williams communicates

15        directly to the debt collector or to

16        Rushmore that Rushmore has an obligation to

17        respond to him.

18             And we put in our papers a recitation

19        of the CFPD exemption as well as the

20        statutory provisions that say if the

21        communication comes from the borrower it

22        goes to the creditor, it's not subject to

23        the act.  And there is a large concern here,

24        I mean there are servicers all around the

25        country trying to alleviate the faulted

1           mortgage loans by working with consumers.

2           And the goal is to resolve those so you

3           don't have more foreclosures.

4               So here what clearly happened was Mr.

5           Williams is quite unhappy that he didn't get

6           a loan modification.  I think if he had a

7           loan modification we're not sitting here.

8               So he communicated to them to try and

9           get his loan modification but if he doesn't

10          get it and he's going to turn around and

11          say, well, you violated the FDCPA by

12          communicating with me directly when I

13          contacted you to find out why I didn't get

14          my loan modification.  So the act isn't

15          designed for that purpose.  That's not what

16          it's there for.

17              And so with all due respect to counsel

18          the record on the summary judgment is not

19          complete to be able to demonstrate that

20          Rushmore initiated any communication going

21          directly to the consumer where he was

22          represented with respect to the debt that

23          wasn't based on an initiated initial

24          communication that came from the consumer.

25              On the Hunt Leibert letter, the letter

```
1              itself says we are aware that you have filed
2              bankruptcy or received a discharge.  The
3              letter is not an attempt to collect the
4              balance on the loan, rather to give you
5              notification of rights you have under
6              federal law.  That wasn't a debt collection
7              letter; it was an FDCPA validation notice.
8                   So number one, we weren't collecting a
9              debt and, number two, it was a federal
10             statutory notice and there is no evidence in
11             the record that Hunt Leibert was aware of
12             the representation.  And as an officer of
13             the court I will also say we have no, I have
14             no and the records don't show that Hunt
15             Leibert was aware of representation.  I
16             think the argument is Rushmore's business
17             records on the loss mitigation
18             authorizations is evidence of representation
19             of the debt and that that evidence is
20             therefore computed to Hunt Leibert as the
21             agent.  I think agency works the other way,
22             it goes from the agent to the principal, but
23             point one is we weren't collecting a debt
24             and that's not a debt collection letter.
25                  And secondly I don't think the evidence
```

1              in the -- the evidence in the summary papers

2              establish his representation with respect to

3              the debt.  I think it's deficient.

4                   THE COURT:  Okay.  I think that brings

5              us to the Defendant's motion for the

6              protective order.

7                   MR. MILNE:  Your Honor, we've tried --

8              I will start in an unorthodox way by trying

9              to identify the issues that we have.  And we

10             have attempted to try to resolve and I think

11             I can ultimately obtain authority that would

12             allow us to potentially indicate that if the

13             Plaintiff were to prove an FDCPA violation

14             that we would stipulate without prejudice to

15             a statutory $1,000 total award.  So to the

16             extent that the Defendant -- excuse me, the

17             Plaintiff wants discovery to prove up the

18             statutory violation, I think I can obtain

19             the authority to be able to say we can

20             stipulate to that issue to carry the burden

21             of proof on that issue.

22                  I think the Defendant's -- excuse me,

23             the Plaintiff's discovery requests seek two

24             depositions of Rushmore at a time in the

25             case where we've already had a motion for

1          summary judgment filed and now essentially

2          argued.  And if I understand it right what

3          the Plaintiff wants to do is if for some

4          reason the motion for summary judgment is

5          denied we're going to change the theory of

6          the case and use the discovery to be able to

7          substantiate a different theory of the case

8          if the theory that was advanced is

9          unsuccessful.

10             The claim in the case based on the

11         dollars even by the Plaintiff's own I think

12         position is that this case on an actual

13         damages basis is $10,000 or less.  The

14         statutory awards a thousand but rules have

15         been amended under Rule 26 for

16         proportionality.  We would probably spend

17         $15,000 at least to prepare for and defend

18         two depositions of two different individuals

19         when most of the communications that are in

20         play are based on roughly 51 phone calls

21         that have already been extracted and

22         produced to counsel in the case.

23             THE COURT:  So let me understand.  Are

24         the 51 -- there are 51 phone calls and there

25         are recordings of those phone calls.  The

1          phone calls were made by Torres and Bennett?

2              MR. MILNE:  And perhaps other employees

3          too.

4              THE COURT:  And the Plaintiff has all

5          those recordings.

6              MR. MILNE:  Yes.  And to be clear, we

7          produced 9 additional recordings this week

8          so there is a total of 60 that have been

9          produced.  And obviously if they are from

10         Rushmore they would as long as they're

11         relevant they're going to be admissions,

12         they're admissible.  So my concern was,

13         well, why do we need to go through and

14         depose two employees of the company and

15         spend $15,000 on a case that's got a

16         statutory award of a thousand, and if

17         there's an actual damages claim maybe it's

18         $10,000, why do we need this discovery,

19         what's the point.

20             And I think this is a good case for the

21         revised Rule 26 on proportionality.  It's a

22         small dollar case putting aside the

23         potential fee application, and I don't

24         understand why we have to go through that

25         burden and expense.  We've already answered

1        at least two sets of interrogatories under

2        oath; we've produced I think several hundred

3        pages of records, if not more than that.

4        And for those reasons I think there's cause

5        for the Court to enter a protective order.

6            If counsel is here saying I can't file

7        my motion for summary judgment because I

8        need to depose these people, okay, I get

9        that.  But that's not what happened.  We've

10       already filed the summary judgment and

11       argued it.  So this is for something else

12       down the line that I truthfully don't

13       understand.  We did have a discussion about,

14       well, maybe it's necessary for punitive

15       damages.  There's no prayer for relief for

16       punitive damages and I don't think you can

17       obtain punitive damages under the FDCPA for

18       a case like this.

19           So I think for all those reasons a

20       motion for protective order should be

21       entered unless counsel can identify a basis

22       to go through the time and expense of that

23       discovery in a case like this.

24           And so the Court is aware, we have been

25       unable to reach stipulations on some of

1         these issues at the moment, so in fairness I

2         issued a notice of deposition for the

3         Plaintiff for Friday.  If we can work

4         through some of these issues perhaps that's

5         not necessary, but at the moment we are

6         where we are.

7              THE COURT:  Okay.

8              MS. FAULKNER:  Rushmore was not

9         interested in --

10             THE COURT:  May I ask your adversary a

11        question?  What do you mean by some of these

12        issues?

13             MR. MILNE:  Well, I'm fairly confident

14        that I can obtain authority to stipulate

15        that if there is an FDCPA violation that

16        there would be a thousand dollar statutory

17        award.  So discovery with respect to the

18        thousand dollars would be off the table.

19             The next issue I think is actual

20        damages and my view of that is, well, the

21        consumer can testify to his actual damages

22        and I will note that in the beginning of the

23        case under Rule 26 I pressed for damages

24        analysis.  I wanted a damages analysis; we

25        didn't get a damages analysis.  And I was

1          told that it's this amorphous, you know,

2          soft tissue damage claim, but how do I try a

3          case on that basis without a representation.

4          So I don't have a damage analysis as to what

5          the actual damages are and there's no

6          medical reports.

7               So we're dealing with quantifying a

8          soft tissue, presumably emotional distressed

9          FDCPA claim that I think counsel would

10         probably agree is probably not worth more

11         than $10,000 on a good day or less.  And it

12         seems to me that's the issue under which

13         counsel wants to take two depositions of the

14         Defendant.

15              THE COURT:  Okay.

16              Go ahead.

17              MS. FAULKNER:  Rushmore is talking

18         about stipulating to the statutory damages

19         if I prove my case, but I can't prove my

20         case unless I get my discovery.  So they

21         want to have it both ways; they want to

22         block my discovery as to issues that they

23         have raised in their answer and as to issues

24         that are in the complaint.

25              The interesting thing is that after I

1          noticed deposition of Rushmore, two people,

2          they noticed my client's deposition and said

3          but if you give up Rushmore depositions

4          we'll give up your client's deposition.  So

5          it's kind of a ploy.

6              Mr. Bennett was not involved in any of

7          the phone calls; Mr. Torres was.  And

8          certainly there are questions about the

9          phone calls and why he persisted in calling

10         after, as my client's affidavit says,

11         October 1st.  I told them don't call me

12         again, talk to my attorney, and on October

13         8th Mr. Torres called him again.

14             Was this in accordance with their

15         policies and procedures?  I don't think so.

16         I think Mr. Torres, when he looks back at

17         what happened, he will say, no, I wasn't

18         supposed to communicate with Mr. Williams.

19             So there are questions as to how

20         vicious how people -- how overbearing, how

21         oppressive this all was, and we would like

22         to get into that.

23             Most FDCPA cases are limited to a

24         thousand dollars damages but you cannot

25         limit discovery just because it's a thousand

1           dollar damage.  You're entitled to discover

2           as to the issues raised in the complaint and

3           the answer.

4              Oh, he's talking about I would agree

5           that the damages are only $10,000 other than

6           the statutory damages.  I wouldn't agree to

7           that.  One of my colleagues the other day

8           got a verdict for $12,000 with one letter

9           that was sent to the client instead of to

10          the lawyer.  And I gave him a whole long

11          list of cases where the damages can be

12          several thousand dollars up to the six

13          figures.

14             So I'm not going to concede that it's

15          only $10,000.  So I think he's talking about

16          figures in a vacuum.

17             THE COURT:  Well, have you provided a

18          damages analysis?

19             MS. FAULKNER:  Yes, I have.

20             THE COURT:  He's telling me he doesn't

21          have one.

22             MS. FAULKNER:  The damages analysis for

23          emotional distress, that sort of thing, are

24          not quantifiable, but what I did was give

25          him a range, a whole bunch of cases, 20 or

1          30 cases with sample jury awards ranging

2          from $5,000 to $160,000 in this type of

3          case.

4              THE COURT:  So anything more you want

5          to say about -- what I hear you saying about

6          proportionality is we don't know what the

7          damages are that could be awarded and how

8          can the Court make a judgment about

9          proportionality if the ultimate figure is

10         unknown --

11             MS. FAULKNER:  No.

12             THE COURT:  -- but that's pretty -- go

13         ahead.

14             MS. FAULKNER:  I'm sorry.  That's his

15         argument.

16             THE COURT:  Yeah.

17             MS. FAULKNER:  My argument is that

18         discovery has to be related to the claims or

19         defenses.  It cannot go beyond the claims or

20         defenses.  So that any discovery as to the

21         claims and defenses is always proportional.

22             THE COURT:  No, I don't think that's --

23         I don't think that's the new rule.

24             MS. FAULKNER:  Oh, well, I would

25         disagree on that because you have to take

1          certain things into consideration but not

2          estimates of what he thinks a deposition

3          would cost if his estimate went up from

4          $3,000 to $15,000 today.  So there is

5          nothing that you can put your finger on to

6          say this is out of proportion because it's

7          related to the claims and defenses.

8              I have to be able to prove my case.  I

9          can't be limited by the amount of cost.

10             In addition, of course, what I thought

11         we would do is do a Skype deposition not,

12         you know, travel to Texas or travel to

13         California.  So I think it wouldn't be very

14         expensive at all.

15             THE COURT:  I gather you'd agree to a

16         video deposition?

17             MR. MILNE:  Your Honor, I would but

18         before we go down that path my thought was

19         potentially to do it at the Court or -- the

20         mechanism for this (unintelligible) would be

21         interrogatories under oath rather than

22         depositions.

23             On the damages analysis, if I had one

24         that said I felt sick this day, I threw up

25         this day, I had a headache this day, I went

1          to the doctor this day.  I don't have that.

2          I have a bunch of case citations that I can

3          pull up myself but that doesn't tell me what

4          happened to the Plaintiff.

5               So and I -- and obviously if I keep --

6          start filing motions to compel sort of

7          driving up the cost of the case it doesn't

8          -- it's not, you know, we've asked for

9          attorney's fees from counsel, they haven't

10         been provided.  So we issued a formal

11         discovery for attorney's fees; we didn't get

12         that.  There was an objection so it's not

13         part of the damages case so therefore we're

14         not going to give it to you.

15              So lawyers are supposed to be working

16         to try and resolve the case.  If we don't

17         have information we can't make decisions

18         without information, so --

19              THE COURT:  So is there anything more

20         than what we label garden variety emotional

21         distress?

22              MS. FAULKNER:  No, I don't think so,

23         your Honor.

24              THE COURT:  No doctor visits, no

25         medication?

```
 1              MS. FAULKNER:  No.  I've told him that
 2        in discovery.  They asked about that.  I
 3        gave them what we had.
 4              THE COURT:  So the distress he's
 5        claiming is the stress from having to deal
 6        with somebody trying to collect the debt.
 7              MS. FAULKNER:  No.
 8              THE COURT:  All right?
 9              MS. FAULKNER:  No.
10              THE COURT:  What's the distress?
11              MS. FAULKNER:  The distress is having
12        to deal with someone who obviously doesn't
13        want to give loss mitigation; who has been
14        deceptive, misleading, taken up his time
15        uselessly, accepted payments uselessly.
16        That kind of annoyance, oppression.
17              THE COURT:  Okay.  All right.
18              Anything else from either of you?
19              MR. MILNE:  If I could have a moment,
20        your Honor?
21              MS. FAULKNER:  We didn't discuss the
22        motion to dismiss the counterclaim or the
23        substitution?
24              THE COURT:  I don't need any argument
25        on that.  If there's anything you want to
```

```
1                  add to the papers I'll hear it, but I've

2                  been over those papers thoroughly.

3                       MS. MILNE:  I'm sorry, I was talking to

4                  Attorney McGrath, your Honor.

5                       THE COURT:  She asked if I wanted to

6                  hear argument on the motion to dismiss the

7                  counterclaim and I said no, I've been over

8                  those papers thoroughly and I don't think I

9                  need any argument.  If there's a point that

10                 anybody wants to make that's outside of the

11                 papers I don't want to deprive you of that,

12                 but I don't need argument.

13                      MS. FAULKNER:  Well, I was just going

14                 to call your attention to your own decision,

15                 your Honor, in the Walsh v. LumiVisions

16                 Architectural case, 15-CV-1210, in which you

17                 decided in these exact circumstances that

18                 there was no diversity jurisdiction.  And

19                 also call your attention to the Supreme

20                 Court of the United States in Grupo

21                 Dataflux, 541 US 567 at 570 to 71, the time

22                 of filing is the time of determination of

23                 whether there is diversity jurisdiction.

24                      THE COURT:  Okay.

25                      MR. MILNE:  Your Honor, in response on
```

1          those issues, I think counsel in her papers

2          says Rule 17 doesn't apply to a

3          counterclaim.  I cite *Zion v. Sentry* that

4          says it does, 258 F.2d 31, albeit it's a

5          1958 decision.

6               Counsel also seems to take issue with

7          the capacity of the counterclaim being made

8          by the different entity in theory, the owner

9          versus the servicer.  A counterclaim may be

10         made against the plaintiff in a capacity

11         different than that in which he is sued if

12         principles of equity and just and judicial

13         economy support that.  It's a Second Circuit

14         case, *Banco National v. Chase Manhattan*

15         *Bank*, 658 F.2d 875.  It's a 1982 Second

16         Circuit decision.

17              THE COURT:  658 F.2d?

18              MR. MILNE:  875, your Honor.

19              And then just shifting gears, on the

20         punitive damages issue, that punitive

21         damages are not available for a fair debt

22         case, I'll cite that *Gervais*, G-E-R-V-A-I-S

23         *v. O'Connell,* 297 F.Sup 2d 435, a 2003

24         District of Connecticut case.

25              THE COURT:  Right.  Anything else?

```
1              MS. FAULKNER:  Punitive damages are

2         available under Cuthbert.

3              MR. MILNE:  If your Honor please,

4         there's no Cuthbert claim in the case.

5              THE COURT:  Yeah.  I know there's not.

6              MR. MILNE:  Okay.

7              THE COURT:  Okay.  All righty.  Thank

8         you call.

9              MR. MILNE:  Thank you, your Honor.

10              MS. FAULKNER:  Thank you.

11              THE COURT:  We're in recess.

12              (Proceedings concluded at 11:36 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        CERTIFICATE

2

3             I hereby certify that the foregoing 68

4  pages are a complete and accurate transcription to the

5  best of my ability of the electronic recording of the

6  Motion for Hearing in re:  MATTHEW D. WILLIAMS vs.

7  RUSHMORE LOAN MANAGEMENT SERVICES, LLC, Civil No.

8  3:15-CV-00673 (RNC) held before The Hon. Donna F.

9  Martinez, United States Magistrate Judge, in Hartford,

10 Connecticut, on February 10, 2016.

11

12

13 Suzanne Benoit, Transcriber         Date:  2/24/16

14

15

16

17

18

19

20

21

22

23
```